UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL CONVENIENCE
DISTRIBUTORS, LLC,

                              Plaintiff,

          – against –

MOUNTAIN CANDY & CIGAR CO.,
INC.,

                              Defendant.

**OPINION & ORDER**

25-cv-00259 (ER)

RAMOS, D.J.:

National Convenience Distributors, LLC ("NCD") brings suit against Mountain

Candy & Cigar Co., Inc., d/b/a Mountain Service Distributors, Inc. ("Mountain Service")

for violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and the New

York common law prohibition against the misappropriation of trade secrets.  Pending

before the Court are two motions brought by Mountain Service:  (1) a motion to dismiss

the amended complaint, Doc. 74, and (2) a motion for sanctions in connection with

NCD's request for injunctive relief, Doc. 60.  For the reasons set forth below, the motion

to dismiss is GRANTED and the motion for sanctions is DENIED.

I.      **BACKGROUND**[1]

NCD and Mountain Service are both convenience store distributors.  Doc. 59

¶¶ 1–2.  J. Polep Distribution ("JPolep") is a tobacco and candy distributor.   Doc. 64 ¶ 7.

In April of 1999, JPolep hired a developer and programmer named Paul Marusek.  *Id.*

¶ 21.  Although Marusek was initially hired as vice president of management information

systems, he eventually served as JPolep's vice president of internal business

---

[1] The background is drawn from the factual allegations in the amended complaint, which, for the purposes
of this motion, the Court must accept as true. *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d
Cir. 2012).

management.  *Id.*  When NCD acquired JPolep in 2020, *id.* ¶ 7, Marusek continued to serve in a similar role, *id.* ¶ 21.

Throughout his tenure, Marusek focused on developing NCD's business systems. *Id.*  For example, Marusek developed proprietary code to integrate an enterprise resource planning ("ERP") system—i.e., third-party software that NCD uses to manage its day-to-day business activities—into NCD's existing servers.  *Id.* ¶ 22.  And when NCD sought to upgrade or update its ERP system through partnerships with third-party software programs, Marusek also coded customized interfaces that allowed the software and the ERP system to "speak to" one another.  *Id.* ¶ 23.  These partnerships included, for example, relationships with three different e-commerce and mobile software systems.  *Id.* ¶ 41.  Integration with these third-party software programs allowed NCD to "make its technology more efficient, streamline distribution processes, and enhance customer end-product and experience."  *Id.* ¶ 18.  Through non-disclosure agreements ("NDAs") and internal naming conventions, NCD kept the name of, and its relationship with, third-party software companies secret pending the development of the software for NCD.  *Id.* ¶¶ 41–42.

In approximately 2009, Marusek began to communicate with Mark Gandulla, Mountain Service's vice president of operations.  *Id.* ¶ 24.  At the time, Mountain Service understood that Marusek was an independent programmer; however, sometime early in their relationship, Mountain Service learned that Marusek was a JPolep employee.  *Id.* ¶ 35.  Indeed, over the years, Marusek exchanged hundreds of emails with Gandulla from his NCD email account, which he sent both from his office and from his home.  *Id.* ¶¶ 31, 35.  Neither JPolep nor its successor, NCD, authorized Marusek to provide ongoing programming services to Mountain Service.  *Id.* ¶ 24.

Because Mountain Service does not have an official IT department, it hired Marusek to provide IT programming services on an as-needed basis.  *Id.* ¶ 24.  These services included Marusek's assistance in writing interfaces for Mountain Service and

providing follow-up support for the interfaces that he wrote. *Id.* ¶ 36. In this capacity, Marusek helped to develop Mountain Service's ERP system, which relies on the same underlying software provider, ██████, as NCD's ERP system. *Id.* ¶ 25. Marusek used his experience in developing NCD's ERP system to accomplish this task. *Id.*

NCD alleges that, through the ongoing relationship between Mountain Service and Marusek, Marusek disclosed and used NCD's trade secrets on behalf of Mountain Service. *Id.* ¶ 35. NCD provides five examples of this alleged misappropriation.

First, because NCD's and Mountain Service's ERP systems are "substantially similar," NCD alleges that Marusek must have used NCD's system design and code as a "template" to develop new interfaces and modules for Mountain Service for a fraction of the time and cost that NCD expended to do the same. *Id.* ¶ 26–27. "At the very least," NCD alleges, "NCD interface coding could be used as a substantial template for the installation of partner software into Mountain Service's ERP System with relative ease." *Id.* ¶ 28; *see also id.* ¶ 40 ("Marusek was able to use and incorporate JPolep's code and interface directly into Mountain Service's ERP system."). Marusek allegedly accomplished this through making "minor adjustments to the JPolep or NCD code to use it within Mountain Service's system." *Id.* ¶ 40. This enabled Mountain Service to avoid the lengthy process that NCD undertook to select new software partners and develop "unique, proprietary interfaces" that allowed for the integration of new software into its internal systems. *Id.* ¶ 27.

Second, on April 10, 2019, Marusek informed Gandulla that JPolep used a mobile software company named MR Williams. *Id.* ¶ 45. At that time, Marusek was working to integrate this same software into NCD's internal systems and modify it to meet NCD's requirements. *Id.* Specifically, Marusek said, "██████████████████ ███████████████████ ██████████████████

███████████████████████" Doc. 9-4 at 2.[2] Gandulla never responded to this email. Doc. 59 ¶ 48. After Marusek completed his work on this software for NCD, he "developed modifications and made database changes to Mountain Service's system and interface using the know-how and coding developed at JPolep." *Id.* ¶ 47.

Third, on May 29, 2019, ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████ NCD alleges that, in doing so, Marusek provided Gandulla with the username and password for an internal, local server that contained the customer ordering program with which Gandulla had requested assistance. *Id.* ¶ 49. The server contained customer data and lists, dispatch driver schedules, and pricing formulas. *Id.* Gandulla accessed the server "for a couple minutes." *Id.*

Fourth, on September 21, 2020, ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

Marusek's response included two screenshots of cigarette pricing formulas. *Id.*; Doc. 59 ¶ 50. ██████████████████████████████

████████████████████████████████

---

[2] The Court may consider the text of this and other emails that NCD attached to its preliminary injunction motion because they are incorporated by refence into the complaint. *See Washington v. City of New York*, No. 18 Civ. 12306 (CM), 2019 WL 2120524, at *3 n.2 (S.D.N.Y. Apr. 30, 2019).

4

██████████████████████████████    Although the "specific cigarette pricing code" that Marusek shared "was derived, in part, from publicly available information," NCD alleges that Marusek developed additional proprietary code and an interface that used this and other information to calculate NCD's final pricing formula. Doc. 59 ¶ 50.  NCD alleges, on information and belief, that "Mountain Service acquired, used, and/or benefitted from NCD's pricing formulas by incorporating them into its own operations." *Id.*

Fifth, on August 29, 2023, Marusek shared with Gandulla that NCD was migrating to a new software partnership to streamline mobile ordering and implement dynamic pricing. *Id.* ¶ 51.  Marusek then used the knowledge and coding from his work on this project at NCD, including NCD's client-side pricing tables, to help Mountain Service set up its own mobile ordering pricing software. *Id.* ¶ 53.

NCD terminated Marusek's employment on October 15, 2024. *Id.* ¶ 33.  At the time, Marusek refused to leave his office until he was allowed to wipe the data from his work cell phone and laptop. *Id.* ¶ 34.  Although NCD's security personnel granted this request, they did so without the authorization of NCD's management. *Id.*  Later, when NCD was training Marusek's replacement, it learned about his emails with Gandulla and Mountain Service. *Id.*

## II.    PROCEDURAL HISTORY

NCD filed this suit on January 10, 2025, Doc. 1, and moved for an *ex parte* temporary restraining order and preliminary injunction three days later, Doc. 7.  On January 28, 2025, the Court denied the motion for a temporary restraining order, directed NCD to serve Mountain Service by January 29, 2025, and set a briefing and hearing schedule for the preliminary injunction.  Doc. 12.  The Court held the hearing on the motion for a preliminary injunction on February 12, 2025, at which it denied the motion. Doc. 37.

Mountain Service served NCD with a motion for sanctions based on NCD's complaint and motion for preliminary injunction on February 24, 2025. Doc. 64-3. After Mountain Service moved to dismiss the complaint on February 26, 2025, Doc. 41, with Mountain Service's consent, NCD requested additional to time respond to the motion to dismiss or amend the complaint, in part to respond to Mountain Service's sanctions arguments, Doc. 53. The Court granted the request and NCD filed an amended complaint on April 11, 2025. Docs. 57, 59. Mountain Service then moved for sanctions based solely on NCD's filing of the motion for preliminary injunction on April 18, 2025. Doc. 60. Mountain Service also moved to dismiss the amended complaint on May 14, 2025. Doc. 74.

## III.    MOTION TO DISMISS

### A. Legal Standard

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In addition, where there is an "obvious alternative explanation" that is more likely, a cause of action is not plausible and must be dismissed. *Id.*

## B. Discussion

In its complaint,[3] NCD asserts two claims: a federal claim pursuant to the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, Doc. 59 ¶¶ 57–68, and a misappropriation of trade secrets claim based on New York common law, *id.* ¶¶ 69–80. Because the elements for stating a claim for misappropriation of trade secrets under New York law "are fundamentally the same" as those sustaining a claim under the DTSA, the Court addresses the claims together. *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citing *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)). For the reasons set forth below, the Court concludes that NCD has failed to state either claim.

### 1. Pleading Trade Secrets with the Requisite Specificity

Mountain Service argues that NCD's claims should be dismissed because, *inter alia*, the complaint fails to adequately identify the trade secrets at issue. Doc. 76 at 19–20. "Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800 (2d Cir. 2023). Thus, "[t]o survive a motion to dismiss, a party alleging that it owns a trade secret must put forth *specific* allegations as to the information owned and its value." *Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018) (emphasis added). "This requirement exists both so that defendants are put on notice of what items they allegedly misappropriated and so that a court can ascertain the protectability of the information at issue." *Sapir v. Rosen*, No. 20-CV-6191 (RA), 2021 WL 4482277, at *7 (S.D.N.Y. Sept. 30, 2021).

While it is "not necessary to disclose every detail of an alleged trade secret in a complaint," *Universal Processing LLC v. Weile Zhuang*, No. 17-CV-10210 (LTS), 2018

---

[3] For the purposes of the instant motion, the operative complaint is the first amended complaint. Doc. 59. For clarity, the Court refers to the amended complaint simply as the complaint.

WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018), a plaintiff must nonetheless specify "the general contours of the alleged trade secrets" without merely restating the elements of one, *Democratic National Committee v. Russian Federation*, 392 F. Supp. 3d 410, 448 (S.D.N.Y. 2019) (quoting *Dardashtian v. Gitman*, No. 17 Civ. 4327, 2017 WL 6398718, at *5 (S.D.N.Y. Nov. 28, 2017)).  "Alleging the existence of general *categories* of 'confidential information,' without providing any details to 'generally define the trade secrets at issue,' does not give rise to a plausible allegation of a trade secret's existence." *Elsevier*, 2018 WL 557906, at *6 (quoting *Next Communications, Inc. v. Viber Media, Inc.*, No. 14-CV-8190 (RJS), 2016 WL 1275659, at *4 (S.D.N.Y. Mar. 30, 2016)).

NCD's claims are premised on Mountain Service's alleged misappropriation of "NCD's Trade Secrets."  *See, e.g.*, Doc. 59 ¶ 68 (seeking to enjoin Mountain Service from "misappropriating, disclosing, or misusing any of NCD's Trade Secrets").  In the introduction to its complaint, NCD defines this term to include:

> (1) software programming and interfaces, including specialized coding, allowing for the integration of a third-party company's software into NCD's internal business systems; (2) software design and the redeveloped software itself; (3) programming modifications or updates to software; (4) confidential, ongoing partnerships with third-party software providers including the names of the partner and its software; (5) unique work product NCD develops in tandem with third-party software providers; (6) pricing processes and formulas; (7) software coding and data; (8) customer data and lists; (9) proprietary business processes and procedures particularly with respect to its IT systems; and (10) industry strategy and technological initiatives.

Doc. 59 at 1–2.  NCD then orients its remaining allegations around this extremely broad term.  *See e.g.*, *id.* ¶ 15 ("Certain high-level employees, including Mr. Marusek, must necessarily have access to NCD's Trade Secrets for daily information.").  In other words, rather than distinguishing between the ten categories of information that NCD alleges constitutes its trade secrets, NCD refers generally to the consolidated category of "NCD's Trade Secrets."  As a result, many of the allegations are conclusory in nature.  *See, e.g.*,

*id.* ¶ 36 ("Over many years, Mountain Service paid Marusek, among other things, to share NCD's Trade Secrets and largely implement them into Mountain Service's ERP System.").

This approach also makes it difficult to determine the object of many of NCD's allegations.  For example, NCD alleges that "NCD's Trade Secrets are . . . protected through the use of passwords and security measures."  Doc. 59 ¶ 13.  But this allegation begs further questions:  Does NCD allege that all ten categories of "NCD Trade Secrets" were password-protected, or just a subset?  What does it mean for a "partnership[] with [a] third-party software provider[]" to be protected by a password?  Which "security measures" apply to which alleged trade secrets?  Here and elsewhere, the use of the term "NCD's Trade Secrets" also leads to seemingly absurd results.  Consider, for instance, NCD's allegation that it "would work with its partners to implement new software and programming into NCD's ERP System, and then, after discussions with Mountain Service and presumably [its] approval, [Mountain Service] would pay Mr. Marusek to implement NCD's Trade Secrets into its similarly designed ERP System."  Doc. 59 ¶ 37.  If one substitutes "NCD's Trade Secrets" with many of the categories included in that term (e.g., "confidential, ongoing partnerships," "pricing processes and formulas," "customer data and lists," "proprietary business processes," or "industry strategy and technological initiatives"), that allegation makes little sense.   How can a "partnership[,]" customer list, or "strategy" be "implemented" into an ERP system?  The complaint offers no explanation for these and other apparent inconsistencies.

The ten categories included in the definition of "NCD's Trade Secrets" fare no better in terms of specificity.  Take, for example, NCD's reference to "pricing processes and formulas."  As in *Sapir v. Rosen*, "the Court is left to wonder:  Pricing [processes and formulas] for which products or services?  With respect to which types of purchasers?  Do[es] Plaintiff[] allege that *every* pricing [process or formula] they make is a trade secret, or only for certain especially sensitive projects or items?"  *Sapir*, 2021 WL

4482277, at *7.  The same problem arises with NCD's reference to "industry strategy and technological initiatives," "software coding and data," "unique work product," and "proprietary business processes and procedures."  In invoking these and other broad categories, NCD appears to have made a strategic decision "to use as broad a vocabulary as possible in the hopes that some terminology would hit upon a trade secret definition." *Id.*  But, as in *Sapir*, "this strategy backfired, because it prevents Defendants and the Court from meaningfully discerning the protectability of specific documents or information and the uniqueness of their compilation."  *Id.*  Thus, insofar as the complaint relies on the broad category of "NCD's Trade Secrets," its allegations are insufficiently specific to render the existence of a trade secret plausible.  *See id.*; *DM Manager LLC v. Fidelity National Information Services, Inc.*, No. 23-CV-00617 (ER), 2024 WL 1347724, at *14 (S.D.N.Y. Mar. 29, 2024) (holding that "vague and conclusory statements describing . . . cutting-edge 'business plan[s],' 'technology,' 'business systems,' and 'methodology,'" were "inadequate to plead the existence of a trade secret").  This, alone, is reason to dismiss the complaint.  *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020).

### 2. *Pleading Misappropriation*

To be sure, where NCD provides "examples" of Mountain Service's alleged misappropriation, it also offers some additional details regarding the contours of its alleged trade secrets.  *See* Doc. 59 ¶¶ 44–53.  But even if these examples sufficiently identified the trade secrets at issue,[4] NCD's claims would fail for a more fundamental

---

[4]  Of course, to state a trade secret claim NCD must do more than simply identify the information that it alleges constitutes a trade secret; it must also plausibly allege that this information *qualifies* as a protectable trade secret.  *See, e.g.*, *Primula Management, LLC v. Primrose School Franchising Co.*, No. 25-CV-1795 (PKC), 2026 WL 508755, at *7 (S.D.N.Y. Feb. 24, 2026) (explaining that even though the plaintiff "ha[d] described its purported trade secrets with sufficient specificity at this stage," the plaintiff "ha[d] not plausibly alleged that the information [the defendant] purportedly misappropriated is protectable as trade secrets").  The Court need not opine on the latter question, however, because, the complaint fails to allege misappropriation for the reasons set forth below.

reason:  the complaint fails to plausibly allege that Mountain Service misappropriated any alleged trade secret.

To state a claim under the DTSA, a plaintiff must plausibly allege that it not only possessed a trade secret, but also that that trade secret was misappropriated by the defendant.  *Medidata Solutions, Inc., v. Veeva Systems Inc.*, No. 17 Civ. 589 (LGS), 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018) (citing 18 U.S.C. § 1836(b)(1)).  And to allege misappropriation, "a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Medidata Solutions*, 2018 WL 6173349, at *4 (quoting *Elsevier*, 2018 WL 557906, at *3).  "In other words, the defendant misappropriates a trade secret (1) when it acquires a trade secret by improper means, or (2) discloses or uses the trade secret without consent." *Id.* Improper means is defined to "include[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6).

Here, NCD fails to plausibly allege either form of misappropriation.  First, NCD cannot state a claim based on Mountain Service's acquisition of any trade secret by improper means because the complaint offers no non-conclusory allegations to support this theory.   Indeed, the only allegations that could support Mountain Service's use of "improper means" refer to Mountain Service's alleged "induce[ment]" of Marusek "to serve as its agent and to breach his contracts and position of trust with NCD."  Doc. 59 at 2; *see also id.* ¶¶ 30, 32, 39.   But because NCD offers no factual allegations to support

11

this contention, its allegations on this score are wholly conclusory.[5] Thus, NCD cannot plausibly allege that Mountain Service used improper means to acquire any trade secret.

NCD also fails to plausibly allege that Mountain Service used any NCD trade secrets without consent.[6] To state such a claim, NCD must plausibly allege that, when Marusek disclosed the alleged trade secrets, Mountain Service knew or had reason to know that Marusek had acquired them through improper means or by breaching his duty to maintain their secrecy. 1 *Milgrim on Trade Secrets* § 1.01(5)(b)(iii) (2025) ("Because of the knowledge requirement, a trade secret claim against a defendant who had obtained the secret from one who wrongfully acquired the secret will need to include sufficient factual allegations to substantiate the defendant's knowledge of the misappropriation."). But here, again, NCD's allegations are conclusory. *See, e.g.*, Doc. 59 ¶ 64 ("Mountain Service both knew and had reason to know that it obtained NCD's Trade Secrets without authorization and by improper means from both JPolep and later NCD."); *see also id.* at 2 & ¶¶ 36, 51, 77. Thus, they cannot give rise to a plausible inference of knowledge. *See In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 695 (2d Cir. 2009) ("Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." (quoting *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987))); *see also Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015) ("Rule 8's plausibility standard applies to pleading intent.").

To be sure, the complaint does allege that Mountain Service "is clearly aware of the value of keeping proprietary information, like NCD's Trade Secrets, confidential and inaccessible to competitors" because "competitors in the industry, including Mountain Service, employ comparable security mechanisms [to NCD] to protect their proprietary

---

[5] Tellingly, NCD does not argue that Mountain Service used improper means to acquire any trade secrets in its opposition to the motion to dismiss.

[6] NCD does not argue that Mountain Service disclosed any trade secret. *See* Doc. 82 at 16 (relying on an acquisition or use theory of misappropriation).

developments." Doc. 59 ¶ 19. In NCD's view, it follows that Mountain Service "knew or should have known of the impropriety of its long-term exploitation of NCD's security mechanisms—through Mr. Marusek—and use of NCD's Trade Secrets without the express authorization of NCD." *Id.* But this allegation—though slightly less conclusory—also fails to render NCD's misappropriation claims plausible. For one, the allegation relates to the wrong time period: Mountain Service's current awareness says little about its knowledge at the time of Marusek's disclosure. In any event, NCD's reference to "proprietary information" and "proprietary developments" is too vague to plausibly suggest that Mountain Service knew or should have known that any of the specific information that it received from Marusek was NCD's trade secret—or that Marusek was under an obligation to keep that information secret. *See Bright Kids NYC Inc. v. Kelly*, No. 19-CV-1175 (JMF), 2020 WL 6891814, at *4 (S.D.N.Y. Nov. 24, 2020) (dismissing a trade secrets claim because the "allegations d[id] not come close to supporting the assertion that [the defendant] knew the information belonged to [the plaintiff], let alone that [the disclosing party] did not have the right to share it"); *see also* 1 *Milgrim on Trade Secrets* § 1.01(2A)(b)(ii) ("[A]n employer that does not know or have reason to know that information it received from a new employee is a third party's trade secret should not be liable for misappropriation."). Because NCD has not pled any *facts* that would support an inference of knowledge—reasonable or otherwise—NCD cannot state a claim for misappropriation.

In resisting this conclusion, NCD argues that "a reasonable competitor" that was aware that Marusek was employed by NCD "would question the propriety" of his decision to "exchange[] hundreds of emails" with that competitor and share "access" to "sensitive information." Doc. 82 at 19–20. NCD also emphasizes that Marusek developed code for Mountain Service after it had completed similar work for NCD. Doc. 82 at 21. But the complaint offers no facts that would suggest that Mountain Service should have known that the information disclosed was, in fact, "sensitive"—let alone a

trade secret. Nor does NCD allege any facts that suggest that Mountain Service should have known that, in sharing this information, Marusek was breaching his duty of secrecy. For example, NCD does not allege facts that suggest that the identities of software partners are generally kept confidential among industry competitors, or that the provision of nondescript log-in credentials for www.jpolep.com would strike a reasonable competitor as confidential information. Thus, at most, these "circumstantial datapoints" render NCD's allegation of Mountain Service's knowledge merely "possible, not plausible." *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19-CV-7367 (JPO), 2020 WL 4570047, at *3–4 (S.D.N.Y. Aug. 7, 2020) (dismissing a trade secret claim on the same grounds). And allegations that are merely consistent with liability cannot survive a Rule 12(b)(6) motion to dismiss.

That is especially true where, as here, there is an obvious, more likely explanation for the defendant's conduct that is inconsistent with liability. *See Iqbal*, 556 U.S. at 681–82 (holding that an inference of unlawful intent was not plausible where there was a "more likely" and "obvious alternative explanation" for the conduct alleged). In particular, the facts suggest that Mountain Service reasonably believed that Marusek was providing IT services based on his "know how" as a developer—rather than any trade secrets—and with NCD's awareness of his outside employment. *See* Doc. 59 1 & ¶¶ 25, 28, 47, 51 (explicitly referencing Marusek's reliance on his "know-how"). Indeed, according to the complaint, Mountain Service hired Marusek—a developer with over a decade of industry experience—to "facilitate its own software developments," "provide programming services," "assist[]" with "writing interfaces," and provide "follow-up support services for the interfaces he ha[d] written." Doc. 59 ¶¶ 21, 24, 36. The complaint also offers a nonculpable explanation for Mountain Service's decision to do so—it alleges that Mountain Service needed these services because it lacks its own IT department, and that, at the time, Mountain Service understood that Marusek was an "independent programmer." *Id.* ¶ 24, 35.

In fact, NCD also alleges that Mountain Service learned soon after hiring Marusek that he was also employed by JPolep. *Id.* ¶ 35. The complaint further alleges "NCD and Mountain Service have substantially similar ERP systems," such that Marusek "could" use the "same code" that he developed for NCD "as a template for the work at Mountain Service." *Id.* ¶¶ 26, 28. But even if Marusek did use the code, NCD does not allege that Mountain Service knew that it used a similar ERP system to NCD's or that those similarities might allow Marusek to use NCD's code as a "template" for his services. Rather, the complaint suggests the opposite: NCD alleges that, to integrate third-party software, NCD and Mountain Service were required to develop code that was "unique" and "customized" to their individual systems. *Id.* ¶¶ 9, 27. The Court also considers it significant that the complaint is devoid of any facts that suggest that Mountain Service sought to conceal its employment relationship with Marusek from NCD. Rather, the complaint alleges that, for years and through hundreds of emails, Marusek "used his NCD employee email account" to communicate with Mountain Service, including while he was "on-site" at NCD's offices. *Id.* ¶¶ 31, 35.

Together, these facts give rise to a more likely, innocent inference that is inconsistent with the allegations of culpable behavior in the complaint: namely, that Mountain Service believed that it was hiring a highly qualified programmer to write new code for its business, and was doing so through an above-board transaction. And as a general matter, there is nothing unlawful about an employee's use of his "know-how" to work for a competitor. *See Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 386–87 (3d Cir. 2021) (explaining that "an employee's general know-how does not constitute trade secret information"); *cf. EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 316 (S.D.N.Y. 1999) ("[A]n employee may not be restrained from using the general techniques learned during his [former] employment." (quoting *Advance Biofactures Corp. v. Greenberg*, 103 A.D.2d 834, 836 (2d Dep't 1984))). Given this more likely explanation, NCD's allegations— even if circumstantially consistent with liability—do not plausibly establish that

15

Mountain Service knew or should have known that it had obtained any trade secret from Marusek or that Marusek's disclosure of any such secret was wrongful. *Iqbal*, 556 U.S. at 681. Because NCD has not plausibly alleged misappropriation, its claims must be dismissed.

## IV.    MOTION FOR SANCTIONS

Mountain Service also moves for sanctions against NCD based on its application for preliminary injunctive relief. Doc. 62. Mountain Service seeks sanctions pursuant to Rule 11, 28 U.S.C. § 1927, and the Court's inherent sanctions authority. The motion is denied.

### A.  Legal Standards

#### *1.  Rule 11*

Federal Rule of Civil Procedure 11 authorizes a court to impose sanctions when a party files or advocates for a pleading that is improper, warrantless, frivolous, or otherwise unsupported by available facts. Fed.R.Civ.P. 11(b)–(c); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (stating that "sanctions under Rule 11 are discretionary, not mandatory"). Importantly, Rule 11 imposes a duty upon counsel to conduct a reasonable inquiry into the validity and viability of their pleadings. Fed.R.Civ.P. 11(b) (noting that "by presenting to the court a pleading, . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after *an inquiry reasonable under the circumstances*," that the pleading is valid and properly brought before the court) (emphasis added); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990) (emphasizing that Rule 11 directs counsel to "stop, think and investigate . . . carefully before serving and filing papers") (quoting Amends. to Fed.R.Civ.P., 97 F.R.D. 165, 192 (1983). A litigant's obligations with respect to the contents of its pleadings "are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they

16

cease to have any merit." *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996) (quoting Fed.R.Civ.P. 11 advisory committee's note to 1993 amendment).

"The standard for imposing Rule 11 sanctions, however, is purposefully high, so as not to stifle legal creativity and zealous advocacy." *City of Perry, Iowa v. Procter & Gamble Co.*, No. 15 Civ. 8051 (JMF), 2017 WL 2656250, at *2 (S.D.N.Y. June 20, 2017). When reviewing a Rule 11 sanctions motion, courts should ensure that any decision is made with restraint. *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003). Accordingly, courts must review the facts "objectively," *see Storey*, 347 F.3d at 388, and "[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable, . . . resolve all doubts in favor of the signer" of the pleading, *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (quoting *Associated Indemnity Corp. v. Fairchild Industries, Inc.*, 961 F.2d 32, 34–35 (2d Cir. 1992)).

"A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Fed.R.Civ.P. 11(c)(2). Such a motion "must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." *Id.* This procedural requirement is "strict," and "an informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient." *Star Mark Management, Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012).

### 2. *28 U.S.C. § 1927 & and the Court's Inherent Authority*

A court may also impose sanctions pursuant to 28 U.S.C. § 1927 and its inherent authority.

Section 1927 looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics. *United States v. International Brotherhood of Teamsters, Chauffeurs,*

*Warehousemen & Helpers of America, AFL-CIO*, 948 F.2d 1338, 1345 (2d Cir. 1991). The purpose of this statute is "to deter unnecessary delays in litigation." *Id.* (quoting H.R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2716, 2782).

The Court may also impose sanctions through its inherent power, which stems from the very nature of courts and their need to be able "'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 42 (1991) (quoting *Link v. Wabash Railroad Co.*, 370 U.S. 626, 630–31 (1962)). The Supreme Court has made clear that because of the "very potency" of a court's inherent power, it should be exercised "with restraint and discretion." *Id.* at 44.

Ultimately, to impose sanctions under either Section 1927 or the court's inherent authority, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (quoting *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 336 (2d Cir. 1999)). These two requirements are generally distinct. *Sierra Club v. U.S. Army Corps of Engineers*, 776 F.2d 383, 391 (2d Cir. 1985) ("[W]e have never held that a frivolous position may be equated with an improper purpose. Such a simple equation would turn the two-part standard into a one-part standard, a step we decline to take."). "Conduct is entirely without color when it lacks any legal or factual basis . . . ." *Wolters Kluwer Financial Services, Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). For a frivolous position to support an inference of bad faith, "the attorney's actions [must be] so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986); *see also Eisemann*, 204 F.3d at 397. Furthermore, "[a] finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Wolters*, 564 F.3d at

114. And "[e]ven where the standard is met, '[t]he Court has discretion to decide whether to impose sanctions under 28 U.S.C. § 1927 and its inherent authority.'" *Doe v. 239 Park Avenue South Associates, LLC*, No. 21 Civ. 279 (JPC), 2022 WL 4592713, at *8 (S.D.N.Y. Sept. 30, 2022) (quoting *Sorenson v. Wolfson*, 170 F. Supp. 3d 622, 634 (S.D.N.Y. 2016), *aff'd*, 683 Fed. App'x 33 (2d Cir. 2017)).

### B. Discussion

#### 1. Rule 11

The Court denies Mountain Service's Rule 11 motion as untimely. "Although Rule 11 contains no explicit time limit for serving the motion, the 'safe harbor' provision functions as a practical time limit." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir. 2003). Thus, "motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission." *Id.* As a practical matter, this means that, "[a]t very least, a party must serve its Rule 11 motion before the court has ruled on the pleading." *Id*. at 89 n.2 (quoting 2 *Moore's Federal Practice* § 11.22[1](c) (3d ed. 2001)).

Here, Mountain Service's Rule 11 motion is predicated on NCD's motion for a preliminary injunction and its supporting papers; however, Mountain Service did not serve NCD with this sanctions motion until February 24, 2025—that is, twelve days *after* the Court denied NCD's application for a preliminary injunction. *See* Docs. 37, 64-3. Thus, NCD did not have the "opportunity to correct or withdraw the challenged submission[s]." *In re Pennie & Edmonds LLP*, 323 F.3d at 89. Accordingly, Rule 11 sanctions are not available.[7] *See Lawrence v. Richman Group of CT LLC*, 620 F.3d 153,

---

[7] Mountain Service argues that "deem[ing] Rule 11 . . . inapplicable" because of its failure to comply with the safe harbor provision "would create a bizarre result" because the "Court denied the PI motion fewer than 21 days after it was served, meaning Mountain Service could not have possibly complied with the 21-day safe harbor provision." Doc. 62 at 6 n.2. That argument ignores, however, that Rule 11 permits courts to shorten or lengthen the safe harbor period. Fed.R.Civ.P. 11(c)(2). The Court also notes that Mountain Service was aware of the basis of its motion well before the Court's preliminary injunction ruling on

158 (2d Cir. 2010) (holding that "sanctions could not be awarded under Rule 11(c)(2)" where the moving party failed to serve the sanctions motion until after the district court disposed of the offending filing). Mountain Service's Rule 11 motion is therefore denied.

2. *Section 1927 and the Court's Inherent Authority*

Of course, even if Rule 11 sanctions are not available, the Court may still impose sanctions pursuant to Section 1927 or its inherent power. *See Olive Group North America LLC v. Afghanistan International Bank*, No. 21-CV-10836 (ER), 2023 WL 2644350, at *6 (S.D.N.Y. Mar. 27, 2023); *Sanderson v. Leg Apparel LLC*, No. 1:19-CV-8423 (GHW), 2024 WL 498094, at *3–4 (S.D.N.Y. Feb. 8, 2024) (holding that a sanctions motion was untimely under Rule 11 but nonetheless considering sanctions under the court's inherent authority). Mountain Service argues that NCD should be sanctioned under either authority because its preliminary injunction motion and supporting papers were both factually and legally frivolous. The Court therefore addresses each argument in turn.

a. *Factual Frivolity*

Mountain Service contends that the motion was factually frivolous because its "core contention that the identities of NCD's software providers constitute protected trade secrets" rests on a premise—namely, that these identities were secret—that is "transparently untrue." Doc. 62 at 6. In support of this contention, NCD argues that "even the most cursory review of public information sources" shows that these identities are "not just incidentally public, but *publicized*, in trade journals and industry articles and on websites and blogs," including by NCD itself. *Id.* at 7. Mountain Service further

February 12, 2025: five days prior to the hearing in which that ruling was issued, Mountain Service sent NCD a lengthy letter that threatened a Rule 11 motion if NCD did not withdraw the preliminary injunction motion by February 11, 2025. Doc. 64-2 at 6. Thus, Mountain Service had ample opportunity to file its Rule 11 motion prior to the Court's preliminary injunction ruling. If Mountain Service was concerned about its compliance with the 21-day safe harbor period, the proper course of action would have been to serve the motion and bring the safe-harbor deadline issue to the Court's attention prior to the scheduled hearing. *See* Wright & Miller, *Federal Practice & Procedure* § 1337.2 n.5 (4th ed. 2025) (collecting cases involving motions to shorten or extend the safe-harbor deadline).

asserts that NCD has "essentially admitted the falsity of this contention" through amending its complaint to allege that the identities were only secret while the software was being developed for NCD.  *Id.* at 8.

The Court disagrees that this aspect of the motion was frivolous.  Contrary to Mountain Service's assertions, in its motion, NCD did not argue that the identities of its partners were *currently* secret.  Rather, the motion and its supporting declaration make clear that NCD kept these identities secret solely while the software was being developed.  Indeed, in his supporting declaration, NCD chief information officer Erich Liendo (the "Liendo Declaration") asserted that "[i]nternal naming conventions mask the identity of the partner companies and their software from the public and are employed *before the names of the partner companies and their software are ultimately integrated into [NCD's] systems*."  Doc. 9 ¶ 24 (emphasis added); *see also, e.g.*, *id.* ¶ 44 ("█████

████████████████████████████████████

████████████████████████" (emphasis added)).   And though the motion describes the names of NCD's partners—which are currently public—as trade secrets, it does so while describing Marusek's alleged *past* disclosures.  Doc. 8 at 7–9.  In doing so, the motion also repeatedly cites the aspects of the Liendo Declaration discussed above.  *Id.* at 2, 6, 8–9.  Thus, in context, the motion solely represented that the identities of its software partners were previously secret; that these identities are currently public does not render that representation false.[8]  Because NCD's claims in this respect are not "entirely without color," they are not sanctionable.  *Eisemann*, 204 F.3d at 396.

---

[8]  The Court also notes that, insofar as there was any confusion as to this distinction, in its reply papers, NCD further emphasized that the confidentiality of the partnerships only extended to ongoing projects.  *See* Doc. 29 at 8 (asserting that "Mountain Service's argument that a Google search reveals NCD's past relationships fails"); *see also* Doc. 30 ¶ 6 ("Anytime a third-party publishes an article discussing the relationship . . . [existing] agreements require approval from NCD and usually do not occur until after the project is over.  Public relations disclosures regarding current or ongoing projects are completely prohibited; we maintain confidentiality throughout a project in order to protect the confidential nature of our developments.").

b. *Legal Frivolity*

Mountain Service separately argues that NCD should be sanctioned because it "entirely ignored" the legal standards that govern applications for preliminary injunctive relief. Doc. 62 at 9. In support of this contention, Mountain Service asserts that the motion: (1) misstated binding authority regarding irreparable harm, *id.* at 9–12, (2) failed to articulate a theory of irreparable harm, *id.* at 11, (3) requested overbroad relief, *id.* at 12–13, and (4) failed to establish NCD's likelihood of success on the merits, *id.* at 13–14. Mountain Service asserts that, together, these failures demonstrate that NCD failed to "evaluate[] the law and sincerely conclude[] [that] it was entitled" to injunctive relief. *Id.* at 9.

The Court disagrees that these aspects of the motion rise to the level of sanctionable conduct. At bottom, all four of these contentions take issue with *strength* of NCD's arguments. Mountain Service asserts, for example, that the motion failed to identify any harms that were sufficiently concrete or persuasively explain why these harms would be irreparable. *Id.* at 11. It also challenges NCD's "vague" definition of trade secrets and decision to abandon certain allegations and its Section 349 claim in its amended complaint. *Id.* at 12–14. Of course, the Court ultimately agreed with many of these arguments in ruling on the preliminary injunction motion and the instant motion to dismiss. But losing arguments are not necessarily sanctionable arguments. *Garcia v. Execu|Search Group, LLC*, No. 17-CV-9401, 2019 WL 689084, at *5 (S.D.N.Y. Feb. 19, 2019) ("[T]he mere proffer of unmeritorious arguments is insufficient on its own to warrant an award under 28 U.S.C. § 1927."). Rather, the imposition of sanctions requires "clear evidence that (1) the offending party's claims were entirely without color, *and* (2) the claims were brought in bad faith." *Eisemann*, 204 F.3d at 396 (emphasis added). And here, though NCD's arguments for preliminary injunctive relief were unpersuasive and sometimes conclusory, they were coherent and grounded in relevant legal standards and precedents. Thus, the Court cannot say that these arguments were "so completely without

22

merit as to require the conclusion that they must have been undertaken for some improper purpose."[9] *Oliveri*, 803 F.2d at 1273; *see also Garcia*, 2019 WL 689084, at *5 (declining to find bad faith "[d]espite the indefensibility of [the non-moving party's] positions," because the non-moving party "'tie[d] its reasoning, however flawed, to recognizable legal concepts'" (quoting *Zurich American Insurance Co. v. Team Tankers A.S.*, 811 F.3d 584, 591 (2d Cir. 2016))).

Nor does the Court find that NCD's motion was otherwise motivated by an improper purpose such as harassment or delay. *Eisemann*, 204 F.3d at 396. Mountain Service offers several arguments in support of its contention that NCD was so motivated.

First, Mountain Service argues that NCD's motion was improperly motivated because it mischaracterized certain emails and, in doing so, disregarded certain "red flags" in the Liendo Declaration. Doc. 62 at 16–18. Mountain Service further contends that NCD's decision to amend the complaint to more accurately characterize these emails "represents a tacit admission that its previous characterizations of the evidence were blatantly false." *Id.* at 16. While that may be true, the Court does not agree that NCD's conduct in amending the complaint supports an inference of bad faith. Indeed, that NCD

---

[9] To be sure, and as Mountain Service notes, NCD's motion did partially rely on a theory of irreparable harm that the Second Circuit explicitly rejected in *Faiveley Transportation Malmo AB v. Wabtec Corporation*, 559 F.3d 110 (2d Cir. 2009). Specifically, NCD argued that it had established irreparable harm simply because it had shown that Mountain Service had misappropriated its trade secrets. Doc. 8 at 17–18. *But see Faiveley*, 559 F.3d at 118 (acknowledging that while some courts had read Second Circuit precedents as establishing that "a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated," "[t]hat reading is not correct"). But, in support of this contention, NCD relied on a recent district court case that incorrectly endorsed this proposition and, in doing so, cited several pre-*Faiveley* precedents. *See* Doc. 8 at 17–18. In its motion, NCD also offered an alternative theory of irreparable harm, which correctly characterized *Faiveley* as holding that a "rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will . . . irreparably impair the value of those secrets." *Faiveley*, 559 F.3d at 118. Given this context, the Court declines to find that NCD's irreparable harm arguments "require the conclusion that they must have been undertaken for some improper purpose." *Oliveri*, 803 F.2d at 1273; *see JGIAP RH 160 LLC v. CRI Holding Corp.*, No. 21-CV-02489 (DG) (JRC), 2023 WL 5979125, at *24 (E.D.N.Y. Aug. 16, 2023), *report and recommendation adopted*, No. 21-CV-02489 (DG) (JRC), 2023 WL 6307320 (E.D.N.Y. Sept. 28, 2023) ("Plaintiff's misunderstanding of the law may have resulted in the assertion of a meritless cause of action, but this alone is not grounds for the imposition of sanctions.").

attempted to address these deficiencies after Mountain Service identified them in its opposition to the preliminary injunction motion and served its sanctions motion suggests good faith. *Cf. Gollomp v. Spitzer*, 568 F.3d 355, 371 (2d Cir. 2009) (holding that "Plaintiff's failure to correct [certain] deficiencies" despite "ample opportunity" to do so supported a "bad faith" finding pursuant to Section 1927). To hold otherwise would discourage parties from promptly correcting errors in their pleadings.

Mountain Service also argues that the "circumstances under which NCD filed the [preliminary injunction m]otion" evince bad faith. Doc. 62 at 18. It highlights that NCD waited nearly three months after its allegedly discovered the basis of its claims to file this case, filed an *ex parte* request for a temporary restraining order, and "wait[ed] as late as possible to serve Mountain Service" thus "ensuring that [Mountain Service] had to prepare an opposition to the [preliminary injunction m]otion in under a week." *Id.* But Mountain Service cites to no authority that suggests that a few-months delay in seeking injunctive relief supports a finding of bad faith; nor does the Court consider it appropriate to draw such an inference in this case, especially given counsel's duty to conduct a reasonable investigation prior to initiating litigation. And though the Court ultimately denied NCD's request for an *ex parte* temporary restraining order, that NCD sought to use this procedural device is not itself evidence of any improper purpose. Mountain Service's assertion that NCD improperly delayed service of its motion is also without merit: NCD served the motion within the deadline set by the Court, and the Court set that deadline in the same order that it set the briefing and hearing schedule for the preliminary injunction. Docs. 12–14. Thus, NCD's timing in serving the motion was not improperly motivated.

In a final effort to demonstrate bad faith, Mountain Service offers—in its words—"speculation" as to NCD's motivations.[10] Doc. 62 at 19–20. But this conjecture cannot support a bad faith finding under Section 1927 or the Court's inherent sanctions authority. *Wolters*, 564 F.3d at 114 ("A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings."). Because the Court cannot conclude with a high degree of factual specificity that Mountain Service acted in bad faith, the Court declines to impose sanctions.

## V.    CONCLUSION

For the reasons set forth above, the motion to dismiss is GRANTED and the motion for sanctions is DENIED. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 60, 74, and close the case.

It is SO ORDERED.

Dated:    March 26, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

---

[10] Mountain Service "speculat[es]" that NCD may have filed the motion because Mountain Service brought a lawsuit nearly a decade ago that named NCD's "predecessor/subsidiary" as one of several defendants, which has resulted in settlements "with every single defendant" except for that the "predecessor/subsidiary." Doc. 62 at 3, 19. Mountain Service also suggests that two references to Mountain Service's recent growth in NCD's motion and supporting declaration "suggest that the [preliminary injunction m]otion was intended to burden a successful competitor." *Id.* at 19–20.